IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:25-CV-00030-FL

| | |
|---|---|
| **James Adam Crosswell,**<br><br>        Plaintiff,<br><br>v.<br><br>**Frank J. Bisignano,** Commissioner of Social Security,[1]<br><br>        Defendant. | **Memorandum & Recommendation** |

    Plaintiff James Crosswell challenges an Administrative Law Judge's decision to deny his application for social security income. Crosswell claims that the ALJ erred when determining his residual functional capacity (RFC) by failing to include nonexertional limitations to address his need to drink water and frequently use the bathroom. Both Crosswell and Defendant Frank J. Bisignano, Commissioner of Social Security, seek a decision in their favor. D.E. 10, 12, 13.

    After reviewing the parties' arguments, the undersigned has determined that the ALJ erred in her determination. The evidence shows that Crosswell consumes a good deal of water as a result of his impairments and medication. So he must often use the restroom due to increased urination. The ALJ failed to account for his water consumption and urination frequency in the residual functional capacity by allowing him additional breaks to use a restroom consistent with the need to which he testified, despite the absence of any contrary evidence. So the undersigned cannot conclude that substantial evidence supports the RFC determination. The undersigned thus

---

[1] The court substitutes Frank J. Bisignano for former Defendants. *See* Fed. R. Civ. P 25(d).

recommends that the court grant Crosswell relief, deny Bisignano relief, and remand this matter to the Commissioner for further consideration.[2]

I. **Background**

  A. **Factual**[3]

In 2014, Crosswell had an abnormal vision test, which prompted an MRI that revealed a brain tumor. Tr. at 26. Providers diagnosed Crosswell with craniopharyngioma. *Id.* He underwent surgery and radiation. Tr. at 424–555. While there has been no recurrence, Crosswell developed a pituitary disorder, hypothyroidism, and diabetes insipidus. *Id.* Providers have prescribed medication, injections, and transdermal therapy. Tr. at 692.

In July 2021, Crosswell received treatment at Carteret Medical Group for low testosterone and marginal cortisol levels. Tr. at 841. He had been off hormone replacement for a month because of family issues. Tr. at 26. Providers continued his topical hormone treatment. Tr. at 841. And they prescribed a low dose of cortisol after previously instructing Crosswell to take it only if he were in a crisis. Tr. at 27.

Seven months later, Crosswell reported that he stopped taking testosterone because of its side effects, although at time he needed it to feel normal. Tr. at 833. He wanted to resume treatment in a different form than topical treatment. Tr. at 27. Providers prescribed him injectable testosterone to control his symptoms and gave him a cortisol shot. Tr. at 833. At a return visit in May 2022, Crosswell stated that the injectable testosterone benefited him more than the topical

---

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

[3] Crosswell does not focus his challenge the ALJ's consideration of his mental impairments and his associated symptoms. So the undersigned will not recapitulate that evidence.

2

application. Tr. at 802. Providers increased his testosterone dosage six months later when his hormone levels fell into the low normal range. Tr. at 750.

In February 2023, tests revealed significantly low cortisol levels and hormone levels that were out of range. Tr. at 693–99. Four months later, providers noted that his conditions were well controlled. Tr. at 27. But two months later he reported fatigue lasting several weeks and increased fluid intake. Tr. at 905–06. Providers prescribed desmopressin. *Id.*

Crosswell testified that he passes out if he does not drink enough water. Tr. at 44. He estimated that with medication, he would use the bathroom ten times over the course of an eight-hour workday. *Id.* If he were not taking medication, he would need to use the bathroom about 20 times over the same amount of time. *Id.* And Crosswell mentioned that he has trouble in hot, wet, and cold environments. Tr. at 46–47.

Crosswell's mother, a nurse, testified about the hormone dysregulations caused by his impairments. Tr. at 49. Testosterone therapy helps, but Crosswell is extremely hormonally deficient, and stress can aggravate his adrenal issues. Tr. at 26, 51. She stated that he needs to drink a lot of water, consumes 40 bottles of water a day, and uses the bathroom a lot. Tr. at 50.

B.  **Procedural**

In May 2023, Crosswell applied for disability benefits and supplemental security income. In both applications, he alleged a disability that began eight years earlier. After the Social Security Administration denied his claim at the initial level and upon reconsideration, Crosswell appeared for a telephonic hearing before an ALJ to determine whether he was entitled to benefits. The ALJ determined Crosswell had no right to benefits because he was not disabled. Tr. at 18–31.

The ALJ found that Crosswell lived with several severe impairments, including status-post craniopharyngioma with resection, pituitary disorder, diabetes insipidus, hypothyroidism,

3

obsessive compulsive disorder (OCD), depressive disorder, post-traumatic stress disorder (PTSD), and generalized anxiety disorder (GAD). Tr. at 21. The ALJ also found that Crosswell's severe and non-severe impairments, either alone or in combination, did not meet or equal a Listing impairment. *Id.*

Next, the ALJ determined that Crosswell had the residual functional capacity (RFC) to perform medium work with other limitations. Tr at 25. He must avoid concentrated exposure to extreme heat, cold, and to workplace hazards defined in the Selected Characteristics of Occupations (SCO) because of diabetes and kidney problems. *Id.*

Crosswell can understand, remember, and carry out instructions for simple, routine tasks that are not subject to specific production requirements, such as assembly line work. *Id.* He can maintain concentration, persistence, and pace in two-hour segments for the completion of such tasks (assuming normal 15-minute breaks in the morning and afternoon and a 30-minute lunch break). Crosswell can frequently interact with supervisors, occasionally interact with coworkers, and have incidental contact with the public. *Id.* And he can adapt to workplace changes involving simple, work-related decisions. *Id.*

Then the ALJ concluded that Crosswell had no past relevant work. Tr. at 29. But considering his age, education, work experience, and RFC, the ALJ found that other jobs existed in significant numbers in the national economy that Crosswell could perform. Tr. at 30. These jobs included counter supply worker, waxer/cleaner, and dining room attendant. *Id.* These findings led the ALJ to conclude that Crosswell was not disabled. Tr. at 31.

After the Appeals Council denied review, Crosswell commenced this action in February 2025. D.E. 1. Both parties ask the court to issue a decision in their favor. D.E. 10, 12, 13.

**II.     Analysis**

Crosswell's impairments cause him to consume a lot of water and urinate frequently. He maintains that he needs additional breaks to use the bathroom. The ALJ limited the exertional demands and environmental conditions of his work. But she included no requirement allowing his frequent bathroom use, finding that normal breaks could accommodate this issue. The evidence refutes the ALJ's conclusion. Because the RFC determination fails to address all of Crosswell's well-supported limitations, the court should remand this matter to the Commissioner for further consideration.

**A.     Standard for Review of the Commissioner's Final Decision**

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

**B.     Standard for Evaluating Disability**

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

5

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id*.

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id*.

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is not warranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

6

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C.     Residual Functional Capacity

Crosswell challenges the ALJ's RFC determination that included no limitation to address his need to drink water and have frequent bathroom breaks. Because the ALJ found that Crosswell could remain on-task while drinking water and normal breaks accommodated his bathroom use, the Commissioner maintains that the evidence supported no additional limitations. The undersigned finds that Crosswell has established that he requires more frequent bathroom use than routine work breaks would allow, and the ALJ erred by omitting a restriction addressing frequent bathroom breaks in the RFC determination.

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability

7

Case 4:25-cv-00030-FL-RN    Document 14    Filed 01/16/26    Page 7 of 12

benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin,* 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Social Security Ruling 96–8p explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p. The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

8

There is no "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis[.]" *Mascio*, 780 F.3d at 636. But "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki* v. *Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The function-by-function requirement can be satisfied by reference to a properly conducted analysis by a state agency consultant. *See, e.g.*, *Linares* v. *Colvin*, No. 5:14-CV-00129, 2015 WL 4389533, at *3 (W.D.N.C. July 17, 2015) ("Because the ALJ based his RFC finding, in part, on the function-by-function analysis of the State agency consultant, the ALJ's function-by-function analysis complied with [Soc. Sec. Ruling] 96–8p." (citing *Lemken* v. *Astrue*, No. 5:07-CV-33-RLV-DCK, 2010 WL 5057130, at *8 (W.D.N.C. July 26, 2010))).

The ALJ determined that Crosswell could perform a reduced range of medium work. Tr. at 25. She included environmental and nonexertional restrictions. *Id.* But the RFC incorporated no limitations allowing Crosswell to drink water and have frequent bathroom breaks. *Id.*

The ALJ noted Crosswell's claim that he needed to drink water and urinate frequently, and had problems in past work when he could not do so. Tr. at 28. She remarked that his past work "was physically intensive and/or in heat and humidity" so she provided limitations addressing those conditions. *Id.* The ALJ also recounted Crosswell's testimony that current medication improved his urinary function to ten times a day. *Id.* And she concluded that normal work breaks would accommodate his bathroom use and he could drink water while staying on-task. *Id.*

As observed by the Fourth Circuit, "[o]bviously, the need to visit the bathroom many times throughout the day impacts one's ability to work." *See Dowling* v. *Comm'r, Soc. Sec. Admin.*, 986 F.3d 377, 389 (4th Cir. 2021); *Mary W.* v. *O'Malley*, No. 1:23-CV-128, 2024 WL 1256268, at *6

9

(M.D.N.C. Mar. 25, 2024). In *Dowling*, the Fourth Circuit held that the ALJ erred by "fail[ing] to analyze whether [the plaintiff]'s RFC was impacted by her need to work near a restroom and take frequent bathroom breaks," because "considerable evidence [existed] in the record demonstrating that [the plaintiff] regularly experienced" issues that "require[d] bathroom breaks at a frequent, and often unpredictable, rate." 986 F.3d at 389.[4]

The evidence does not support the ALJ's findings.

Crosswell correctly points out that normal breaks—a 15-minute break in the morning and in the afternoon along with a 30-minute lunch break—are insufficient to address his frequent bathroom use. Without medication, Crosswell used the bathroom about 20 times in an eight-hour period. Tr. at 44. But medication reduced the frequency of urination to about ten times in an eight-hour period. *Id.* There is no evidence that contradicts this allegation. And the ALJ erred in stating that his testimony was that he used the bathroom ten times *a day*. Tr. at 28.

Crosswell's mother confirmed his statements. A nurse, she testified about the hormone dysregulations caused by his impairments. Tr. at 49. She observed that he must drink lots of water to maintain functioning. *Id.* She stated that Crosswell needs to drink a lot of water, consumes 40 bottles of water a day, and uses the bathroom a lot. Tr. at 50. Her son lost jobs because he took too many breaks to consume water and use the bathroom. *Id.* And she remarked that Crosswell has a limited ability to engage in physical work because he must drink water and becomes weak. Tr. at 56–57.

---

[4] Other cases have addressed an ALJ's failure to make specific findings about the frequency and duration of a claimant's bathroom use when he has a condition that requires access to a bathroom. *See Binder* v. *Colvin*, No. 5:12-CV-517-D, 2013 WL 1686306, at * 3 (E.D.N.C. Mar. 21, 2013) ("When an ALJ finds that a claimant has an impairment that requires him to have access to a bathroom, the ALJ should make specific findings concerning the frequency and duration of Plaintiff's bathroom usage."), *adopted by* 2013 WL 1694678 (Apr. 18, 2013); *Taylor* v. *Astrue*, No. 7:11-CV-162, 2012 WL 3637254, at *11 (E.D.N.C. Aug. 1, 2012). The ALJ made no finding here on whether Crosswell's conditions require more frequent bathroom use than an average person, although there is little doubt he must use a bathroom often.

Increased fluid consumption and output are typical symptoms of diabetes insipidus. *See* Stedman's Medical Dictionary 243230 (observing that diabetes insipidus involves "chronic excretion of very large amounts of pale urine . . . causing dehydration and extreme thirst" and "excessive fluid intake[.]"); Arginine Vasopressin Disorders (Diabetes Insipidus) *available at* https://my.clevelandclinic.org/health/diseases/16618-diabetes-insipidus (last visited Dec. 19, 2025) (noting that the main symptoms of diabetes insipidus are extreme thirst, frequent urination, and a large urine output, which can be seven to twenty times more than the average person).

What's more, the RFC's exertional and environmental limitations fail to address all of Crosswell's symptoms. The ALJ pointed out that Crosswell had jobs that were physically intensive or involved hot, humid conditions. Tr. at 28. And she acknowledged that he had trouble performing work where he could not drink water or frequently urinate. *Id.*

Filing to recognize the nature of Crosswell's impairment, the ALJ improperly merged these circumstances to suggest that physically demanding work in hot, humid conditions caused Crosswell problems. In fact, his increased water consumption and more frequent urination is attributable to diabetes insipidus. Regardless of the exertional demand or environmental conditions of any job, he must drink a lot of water and frequently use a bathroom. Prior work demands and conditions may have exacerbated his need to consume water and urinate frequently. But there is no evidence that limiting Crosswell to medium work while avoiding extreme temperatures and hazards reduces the amount of water Crosswell must drink or the frequency he urinates.

In sum, the record contradicts the ALJ's conclusions about Crosswell's increased water consumption and frequent urination. The undersigned cannot conclude that substantial evidence supports the RFC determination that includes no limitation to account for his frequent bathroom use, which the record shows normal breaks do not adequately address.

11

Because this matter warrants more consideration, the undersigned recommends that the court grant Crosswell's claim on this issue and remand the matter to the Commissioner.

## III. Conclusion

For these reasons, the undersigned recommends that the court grant Crosswell's request for relief (D.E. 10, 13), deny Bisignano's request for relief (D.E. 12), and remand this matter to the Commissioner for further consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: January 15, 2026

_____
Robert T. Numbers, II
United States Magistrate Judge